CITY OF JACKSON *v.* REED, A MINOR

No. 40764 April 28, 1958 102 So. 2d 342

282

May 26, 1958 103 So. 2d 7

*Butler, Snow, O'Mara, Stevens & Cannada, E. W. Stennett, W. T. Neely,* Jackson, for appellants.

*Lipscomb, Ray & Barksdale, Carl C. Bostic,* Jackson, for appellees.

Lee, J.

Roy Henry Reed, a minor sixteen years of age, by his Mother and Next Friend, Mrs. Henrietta Reed, sued the City of Jackson, Mississippi, and Walter Riddley, its employee, to recover damages for personal injuries sustained as a proximate result of the alleged negligence of the defendants. There was a verdict and judgment against the defendants for the sum of $85,000, and the City appealed.

The declaration charged that a collision occurred at the intersection of North West and Manship Streets in the City of Jackson between the motorcycle on which the plaintiff was proceeding north on North West Street and the truck of the City, operated by Riddley, in the course of his employment, proceeding south on North West Street, as the truck was making a left-hand turn into Manship Street. Negligence was charged on the part of Riddley in failing to keep a proper lookout, in failing to have the truck under control, and in the way and manner in which he made the turn. Sections 8182, 8189(b), 8192, 8193, 8194, and 8196, Code of 1942 Recompiled, and Section 1683 (B), City Ordinance of the City of Jackson, Mississippi, were particularly invoked.

The answer of the defendants admitted the agency of Riddley but denied all of the other material allegations of the declaration, and alleged that the truck was lawfully in the intersection and that the collision, resulting in injuries to the plaintiff, was the proximate result of his own negligence.

Two maps, showing this intersection in great detail, were introduced in evidence. North West Street at this point was forty-four feet wide from curb to curb. It had four traffic lanes. Two of these, west of the center line, eleven and eleven and one-half feet wide, were for southbound traffic; and the two lanes east of the center line, 10.7 and 10.9 feet respectively, were for northbound traffic. The center line was painted yellow, and the lines between the other lanes were painted white. In the center of this street, directly opposite the intersection by Manship Street from the east, was a sewer manhole. The paved portion of Manship Street at this point was 37.7 feet, and curbs and sidewalks were on each side. From the center of the intersection, looking south, it was six hundred and fifty feet to the north curb of Fortification Street, with clear vision all of the way.

The attention of Ashton L. Wren, proceeding south in his car about half of a block behind the truck, was attract-

ed to a commotion on the left. He stopped his car and was the first person to put a hand on the unconscious Reed boy, whose feet were tangled in the motorcycle. He indicated the position on one of the maps. The City truck had proceeded out of North West Street into Manship Street on the north side, definitely against traffic, and within a step of the north curb. The cap was off of the gas tank, about midway of the right side of the truck, and there was also an identation on it. About one-fifth of the headlight of the motorcycle had been broken, and the handlebars pushed back, but the front wheel had not been damaged, nor had the tire been blown out.

Delmar L. Simmons, driving north on North West Street at twenty-seven or twenty-eight miles an hour, saw the Reed boy as he passed on his motorcycle, south of the intersection with Fortification Street. The boy had the green light at that intersection, but the red light caught the witness. For that reason, Simmons arrived at the scene of the collision in a matter of seconds after Wren, and gave substantial corroboration to the evidence of that witness. He said that the boy was lying one and one-half to two feet west of the east curb line of North West Street, and that the City truck was about three feet from the northeast curb of Manship Street, and that he could step from the running board of the truck to the curb.

Mrs. Ruby Nell Blackwell had seen the Reed boy leave the Y M C A building on his motorcycle just before she and her husband left in their car. The routes, taken by them, were different, but approximately the same in distance. They drove at a speed of about thirty miles an hour, and when they arrived at the scene only one or two people (evidently Wren and Simmons) had preceded them.

The unconscious and desperately injured boy was taken to the hospital where he was first examined by Dr. Lawrence W. Long, who called Dr. Charles L. Neill

into the case. A tracheotomy was performed to permit breathing, and the tube was utilized for weeks. The left lung was collapsed from a fracture of the fifth rib. One of his knee joints was fractured. It was necessary to pack him in ice to reduce the body temperature to ninety-two or ninety-four degrees in order to keep fever from burning him up. The brain was scrambled or addled. The kidney functions were affected. He was in the hospital forty-two days. His mother, a practical nurse, was positive that it took about five weeks for him to regain consciousness.

Before the injury, he attended the Y M C A school for a half day because he had to work the other half; and for such work, he earned $25 per week. He was a healthy boy, with a good disposition, swam, played baseball, and danced. Since the injury, it is hard for him to speak words well and it takes time for him to do so. When he tries to walk, he stumbles or falls over. Dr. Neill doubted that the boy would ever be able to make a living or be gainfully employed. It was his opinion that he might, under supervision, learn to stack cans on a store shelf, but would not be able to operate a cash register. Dr. Long was of the opinion that the boy had made no appreciable improvement for the period of two months previous to the trial; that he has a mental age of between four and six years; that he knows nothing about the accident; and that he will require custodial care as long as he lives. Dr. Neill's bill was $445, of which Blue Cross paid $117; Dr. Long's bill was $458; the cost of nurses was $726; and the hospital bill was $1,406.02.

Walter Riddley, the driver of the truck and one of the defendants, was called as an adverse witness for the purpose of cross-examination. It was developed that, at the time of the accident, he had worked for the City only three and one-half weeks. This was his first experience in driving the kind of truck that the City used. H. D. Shearer, his foreman, was sitting in the cab with

him. They were proceeding south, intending to make the left turn from North West Street into Manship Street for the purpose of going to the warehouse to obtain cement. He said that he came to a stop and stuck his hand out. A northbound car then passed. He looked south again, saw nothing, looked into Manship Street, and started his turn. He said that he did not see the motorcycle before he started to turn or after he had turned. In fact he did not see it at all until after the collision. After he turned, Shearer said, "Watch, he is coming right into you", and in just a second the motorcycle hit the truck. After a full explanation of the map was made to him, he was asked to take a pencil and draw the course which he followed in making the left turn. He drew on the map both a dotted and a solid line, with only slight variations. He also put an "x" where he stopped originally and started up for the turn. According to this drawing, he did not go around the sewer manhole, which is in the center of the intersection, keeping it to his left, but cut into his left about halfway between the north line of the intersection and the manhole, definitely against any traffic that might have been coming out of Manship Street. The witness admitted that the City authorities, on Friday before the trial, had him at the scene of the collision; that a white man made several practice runs, and then said, "Come on, Walter, let's see you practice some"; that he pulled up and back six or eight times; that he was trying to get the truck next to the curb where the collision occurred; and that policemen were holding up traffic during this experiment. When he was asked if he was practicing for this trial, he replied "Not as I know of, I don't know, sir, I just don't know what I was doing."

H. D. Shearer, Foreman of the Sewer Department, in testifying for the defendants, said that he told Riddley to make the left-hand turn at Manship Street, but he did not know whether in fact a signal for that pur-

pose was given. The truck stopped to let traffic pass, and then started the turn. The witness looked south and the motorcycle was not there. The second time he looked, he saw the motorcycle three hundred and fifty or four hundred feet away. The truck at the time was moving not over three, four or five miles an hour, and its front end was on the middle line that divides the two northbound traffic lanes. When the motorcycle was about fifty or sixty feet away, the witness said "Walter, he is going to hit us." He estimated its speed at fifty miles an hour, and the motorcycle hit by the time he finished the statement to Riddley. The driver then whirled his truck to the left. At the time of the collision, the motorcycle was about two feet from the east curb. It hit the gas tank of the truck. He said that the truck traveled about six or seven feet after the collision. He admitted that it was nearer the north curb of Manship Street when it stopped, and that the motorcycle did not move the truck.

The witness, although it was fully explained to him, said that he did not understand the map well enough to indicate where the truck started its turn. He did, however, point at the map as to the course of the truck, but would draw no line. Using the line which had been drawn by Riddley, counsel asked if the truck turned that way, and his reply was "I don't know, I just don't know." The witness further said that the truck, which was going three, four, or five miles an hour "had crossed ten feet and eight inches there while this motorcycle was coming three hundred and fifty or four hundred feet." He denied that he told E. E. Evans, a police office investigating the case, that he never saw the boy at any time until after the accident had occurred and until he got out of the truck. He admitted that he did not tell the officer anything about the rate of speed that the boy was making, and said that the officer did not ask him. He admitted that he was present and was

sitting in the truck on Friday before the trial when Riddley was making practice runs, but said that he did not know what they were trying to do; and that counsel for the City had told him to go out there.

W. W. Butler, a witness for the defendant, admitted that the front wheel of the motorcycle, nineteen inches in diameter, was intact; that the tire was not blown out; and that the handlebars were bent back.

Measurements by William R. Grissett, an accident investigator for the City, showed that the point of impact was two feet from the east curb line, ten feet from the northeast corner, twenty-six feet from the southeast corner, and, after the truck had stopped twenty-six feet from the front of the truck, which was twenty-one feet long. When he made the measurements, the left wheel of the truck was four feet, and the left front wheel seven feet, from the north curb. There was nothing to obstruct the view between the intersection and Fortification Street.

In rebuttal, E. E. Evans testified that, in a conversation with Shearer, "I asked him did he see the boy coming?" When counsel asked what the answer to that question was, the witness replied "He said no, he did not see it until after the accident had happened."

A number of photographs of the scene, the motorcycle and the truck, were introduced in evidence. The Reed boy, owing to his disability, did not testify.

The appellant's first contention is that it was entitled to a peremptory instruction. The basis for this position is that the two eye-witnesses, Riddley and Shearer, testified positively that the motorcycle was not in sight, at least six hundred and fifty feet away; when the turn began that the truck was lawfully in the intersection; and that the sole, proximate cause of the collision was the gross negligence of Reed in running his motorcycle into the truck.

Section 8189 (b), Code of 1942 Recompiled, on turning at intersections, provides: "Approach for a left turn

shall be made in that portion of the right half of the roadway nearest the center line thereof and after entering the intersection the left turn shall be made so as to leave the intersection to the right of the center line of the roadway being entered.''

Section 1683 (B) of the Ordinances of the City of Jackson provides: ''Turning Left. The operator of a vehicle intending to turn to the left at an intersection or into a driveway shall approach the point of turning in the lane for traffic to the right of and next to the center of the roadway, and, unless otherwise directed by 'turning markers', the operator of a vehicle in turning left at an intersection shall pass to the right of the center of the intersection before turning. Upon streets laned for traffic and upon one-way streets a left turn shall be made from the left lane of traffic.''

■■ ■ Riddley, both by his answers and in pointing out the course of his left turn, admitted that he did not comply with the above state and municipal provisions. In other words, he admitted that he violated them. The appellant frankly concedes that Riddley ''cut the corner'', since he violated the above provisions in the way and manner in which he made the left turn. The court properly instructed the jury that he was guilty of negligence in this regard. White v. Weitz, 169 Miss. 102, 152 So. 484; G. & S. I. R. R. Company v. Bond, 181 Miss. 254, 179 So. 355; Robinson v. Colotta, 199 Miss. 800, 26 So. 2d 66; Planters Wholesale Grocery Company v. Kincade, 210 Miss. 712, 50 So. 2d 578. But the instruction went further and required the jury, before it could find a verdict for the plaintiff on account of that negligence, to believe from the preponderance of the evidence that such negligence was a proximate, contributing cause of the collision.

The appellant, while conceding negligence in cutting the corner, contends that such negligence was not a proximate, contributing cause; that there was no causal

connection between it and the collision; and that the sole, proximate cause of the collision was the gross negligence of Reed.

A like contention was made in Planters Wholesale Grocery Company v. Kincade, supra. The opinion in that case, answering the contention as to proximate cause, cited Cumberland Telephone and Telegraph Company v. Woodham, 99 Miss. 318, 54 So. 890, and other cases which follow the rule there enunciated.

The appellee affirms just as vigorously that the jury was warranted in finding that such negligence was a proximate, contributing cause. In that connection, the lines drawn by Riddley to indicate his course showed that he began his turn about halfway between the north line of the intersection and the sewer manhole; and that the motorcycle struck the truck near the east curb. It is apparent that, if the truck had proceeded the additional distance to and around the sewer manhole before making the left turn, as the law required, it could be reasonably concluded that no collision would have occurred. Especially is this true inasmuch as the impact was in the middle of the truck, ten and one-half feet from the front. In other words, had the truck traveled eleven and one-half or twelve feet less than it did travel, obviously no collision would have taken place. According to Riddley's own drawing the jury was warranted in finding that if the truck had complied with the law, it would not have been in the pathway of the motorcycle and no collision would have resulted.

 █ In Matthews, et al. v. Thompson, et al., 231 Miss. 258, 95 So. 2d 438, the Court was dealing with proximate, contributing and intervening causes. Several cases were cited and quoted from, including the Woodham case, supra, and Public Service Corporation, et al. v. Watts, 168 Miss. 235, 150 So. 192. An authority for the recognized rule that "* * * when reasonable minds might differ on the matter, the question of what is the

proximate cause of an injury is usually a question for the jury * * *'', the opinion cited 65 C. J. S., Negligence, Section 264; American Creosote Works of Louisiana v. Harp, 215 Miss. 5, 60 So. 2d 514, 35 A. L. R. 2d 605; Magers v. Okolona H. & C. C. Railroad Company, 174 Miss. 860, 165 So. 416, and Restatement of the Law of Torts, Section 434.

Under Section 1455, Code of 1942 Recompiled, all questions of negligence and contributory negligence are for the jury to determine. Brewer v. Town of Lucedale, 189 Miss. 374, 198 So. 42; Gulf Refining Company v. Brown, 196 Miss. 131, 16 So. 2d 765; Davidson v. Mc-Intyre, et al., 202 Miss. 325, 32 So. 2d 150; and Planters Wholesale Company v. Kincade, supra.

Passing from the question of Riddley's negligence in the way and manner in which he cut through the intersection instead of going around the manhole, there was also involved the question of whether the motorcycle, at the time when Riddley began his turn, was within the intersection or so close thereto as to constitute an immediate hazard, under Section 8196, Code of 1942 Recompiled.

Both Shearer and Riddley testified that they looked south before and at the time of making the turn and they saw no motorcycle. Shearer said that he saw the motorcycle, about three hundred and fifty or four hundred feet away, coming at a speed of fifty miles an hour; that the truck was moving three, four, or five miles an hour; and that the truck moved not more than its length before it was struck in the middle. Riddley testified that he heard Shearer say that it was going to hit them, but he did not see the motorcycle until after the collision. On the contrary, from the evidence of Simmons and Mr. and Mrs. Blackwell, the jury could have concluded that the speed of the motorcycle was around thirty miles an hour. Also the damage to the motorcycle was slight. If it traveled three hundred and fifty to four

hundred feet while the truck was going only its length, at the speed given by Shearer, it is apparent that the motorcycle speed was seventeen to twenty times the speed of the truck, or in excess of sixty, or seventy or eighty miles an hour. There was ample warrant for the jury to find that such evidence of Shearer and his location of the motorcycle when the turn started was unreasonable and was contradicted by the physical facts and circumstances. Moreover, if what Evans testified to was true, Shearer did not see the motorcycle until after the collision. Riddley was a defendant. Shearer was his foreman and an employee of the City. The appellant cannot invoke with assurance the rule that "* * * where the testimony of a witness is uncontradicted and he is not impeached in some manner known to the law and is not contradicted by the physical facts and circumstances it must be accepted as true", Tombigbee Electric Power Association v. Gandy, 216 Miss. 444, 62 So. 2d 567, because the jury could have found both an impeachment of Shearer and contradiction of his and Riddley's version by the physical facts and circumstances.

Ordinarily the interpretation of physical circumstances is the function of the jury. Standard Oil Company v. Crane, 199 Miss. 69, 23 So. 2d 297. "All conflicts in evidence, credibility of witnesses, and questions of impeachment of witnesses, are within the province of the jury in the trial court." C. & R. Stores, Inc. v. Scarborough, 189 Miss. 872, 196 So. 650.

Consequently the court properly refused the appellants requested peremptory instruction; and the verdict was not against the overwhelming weight of the evidence.

The appellant also contends that the question of insurance was erroneously injected into the trial; that prejudice resulted; that the trial court should have sustained its motion for a mistrial; and that the cause should be reversed and remanded for a new trial.

This question arose in this way: Delmar L. Simmons testified that he was driving twenty-seven or twenty-eight miles an hour when the motorcycle passed him. He did not say how fast it was traveling, but did say that the boy was not speeding. At the scene of the accident, he gave his name and telephone number to one of the city investigators. Later at the request of Sgt. Williams of the police force, he wrote a letter in which he stated, among other things, that "The young man passed me just before we left the intersection of North West and Fortification Streets * * * I was making about thirty miles an hour and the young man passed me making considerably more speed than that * * *". He also said that Judge Stennett and Mr. Junior O'Mara, attorneys for the City, came to see him and questioned him. On cross-examination, counsel for the defendants, evidently for the purpose of impeaching the statement of the witness as to the speed of the motorcycle, introduced the letter and had Simmons to identify it. The record then discloses the following:

"BY MR. O'MARA:

That's all.

"BY MR. LIPSCOMB:

I think that's all. Can we excuse Mr. Simmons now?

"BY THE COURT:

Yes, sir, you may go.

"BY MR. LIPSCOMB:

Just a moment, Mr. Simmons.

### "REDIRECT EXAMINATION

"BY MR. LIPSCOMB:

Q Mr. Simmons, do you recall the circumstances under which that letter was written? Do you recall it?

A I recall the sergeant calling me over the phone— he didn't come to see me—and asked me to give a statement, and I dictated the letter.

Q Did you give Mr. O'Mara a statement?

A Yes, sir, I did.

Q Did you keep a copy of it?

A No, sir.

"BY MR. LIPSCOMB: (turning from Witness to Mr. O'Mara) asked:

Do you have any objection to our seeing it?

A I answered the questions that they came up there and got. Now, Mr. — Mr. Bostic asked me to sign something.

"BY MR. BOSTIC:

I don't know whether you signed it or not. No, you didn't sign the one that I've got.

A No, the insurance man asked me to sign something.

"BY MR. O'MARA:

Judge, would you excuse the jury a minute, please, sir?

"BY THE COURT:

Yes. Let the jury retire, Mr. Sheriff."

The jury was retired and counsel for defendants made a motion for a mistrial because of the statement of the witness "No, the insurance man asked me to sign something", contending that such statement injected the fact that insurance was involved. Statements were made by both Messrs. O'Mara and Lipscomb, and the court held that the words of the witness were unsolicited, inadvertent and voluntary but that counsel for defendants could give him a brief on the question by the next morning. The next morning, the defendants renewed their motion and both of the named attorneys made extended statements. Mr. Lipscomb said that he had no inkling that Simmons had ever talked to any insurance man and he did not know what insurance man the witness was talking about. He further stated that the plaintiff would be willing for the court to instruct the jury that Simmons' remark had nothing to do with the case and that they should wholly disregard it. Mr. O'Mara replied that this would simply add gasoline to the fire. The

judge, having held the words unsolicited, inadvertent and voluntary, as stated above, said that he would not order a mistrial, that it was not clearly apparent that the error was prejudicial, and that such alleged error was not so apparent to him. Consequently the motion was overruled.

On numerous occasions this Court has had under review cases where the subject of insurance was injected. Typical of reversals, or error in refusing to order mistrials, are the following: (1) Where plaintiff's counsel raised it in the voir dire examination of jurors. Shearron v. Shearron, 219 Miss. 27, 68 So. 2d 71. (2) Where a juror, on voir dire examination, told what he had heard about a man with a broken neck "trying the contractor and insurance company." Odom v. Walker, 193 Miss. 862, 11 So. 2d 452. (3) Where plaintiff's counsel made improper argument thereon. Byram v. Snowden, (Miss.) 79 So. 2d 541. (4) Where plaintiff's counsel brought out the subject in the cross-examination of the defendant. Herrin v. Daly, 80 Miss. 340, 31 So. 790. (5) Where plaintiff's counsel in cross-examination extracted it from a defense witness. M. & A. Motor Freight Lines, Inc. v. Villere, 190 Miss. 848, 1 So. 2d 788. (6) Where plaintiff's counsel elicited it in direct examination of his own witness. Whatley v. Boolas, 180 Miss. 372, 177 So. 1.

Typical of cases where the Court refused to order reversals on that account are the following: (1) Where counsel for the defendants first brought the matter out, and counsel for the plaintiff later elaborated. Peterman v. Gary, 210 Miss. 438, 49 So. 2d 828. (2) Where counsel for plaintiff first introduced the matter, but the defendant later disclosed that she made a report to her insurance agent. Chilcutt v. Keating, 220 Miss. 545, 71 So. 2d 472. (3) Where plaintiff's counsel asked the doctor if he did not make the examination as a representative of the insurance company, but the witness said

that he did not, that the defendant paid his fee, and that he did not know of the defendant's having insurance in this or any other matter, the Court saying: "It will be noted that the question did not apply to indemnity from loss by an insurance company, and neither this court now, with the record before it, nor the doctor at that time, by any strained construction of the language, could have determined whether the question applied to accident insurance which might have been carried by the appellee, Miss Pearce, or to liability insurance. All of this is purely a matter of conjecture, as shown by this record." Miss. Ice and Utilities Company v. Pearce, 161 Miss. 252, 134 So. 164. (4) Where plaintiff's counsel elicited from the doctor that the Sanitarium, in which he was interested, had a contract with an insurance company, whose agent was the husband of the defendant, the Court saying: "It was not shown that appellant had a policy with the insurance company indemnifying her against any judgment appellee might recover; therefore we cannot say, with any degree of certainty, that what occurred was calculated to bring an element into the case that the jury had no right to consider." Williams v. Larkin, 166 Miss. 837, 147 So. 337. (5) Where the attorney for one of the three adversary defendants drew from a witness for the plaintiff that the insurance adjusters had made the measurements. Lancaster v. Lancaster, 213 Miss. 536, 57 So. 2d 302. There the arguments, pro and con, were practically the same as are made here. The opinion said: "Such references when brought out by plaintiff's counsel are almost invariably ground for reversal. It is impossible to catalog all similar references and assign each to a definite category. The rule may not be uniformly packaged for general use under any designated label. Each case presents its own problem. Both the facts and the factors are unique. After repeated analysis of the situation presented here we have concluded that this error is not reversible."

Our cases do not seem to have dealt with the effect of unsolicited, inadvertent, or voluntary answers.

In 4 A. L. R. 2d 784, on the topic of voluntary, unexpected, unresponsive and incidental answers, it is said: "By weight of authority, if counsel propounds a question which calls for proper evidence, the fact that an irresponsive or inadvertent answer includes a reference to insurance will not be ground for declaring a mistrial."

Annotated thereunder are cases from the courts of the United States and twenty state jurisdictions. See Brazeale v. Piedmont Mfg. Company, 184 S. C. 471, 193 S. E. 39, a South Carolina case, which seems to hold that the only remedy that the trial court can give in such a case is to grant a motion to strike out the objectionable testimony and to instruct the jury to disregard it.

In the case of Coker v. Moose, 68 P. 2d 504, an Oklahoma case, counsel for plaintiff, on cross-examination, in an effort to find out the name of the person to whom the witness had given a statement, asked "Did you know where he was from?" The answer was "No, sir, he claimed to be representing the insurance company." The objection of the defendant was sustained by the judge, who remarked "It is a voluntary statement." The opinion, in overruling the contention that the trial court was in error in not declaring a mistrial, made this observation: "There is no evidence at all that the jury ever knew that either of the defendants was protected by insurance. The statement of the witness imparted no such information."

The appellee suggests that, since Dr. Neill testified that his bill was for $445 and that $117 thereof was paid by the Blue Cross, the jury could have believed that a representative of that company was making the inquiry, or that the jury could have believed that the owner of the motorcycle carried collision or liability insurance thereon and that the agent of that company was making the inquiry.

At any rate, the kind of insurance written by this man was not shown. It would be difficult indeed for this Court to say with any degree of certainty, that the answer of the witness, namely, "No, the insurance man asked me to sign something", led the jury to the conclusion that the City was covered by liability insurance for the accident.

It is a serious matter to set aside the verdict of a jury and the solemn judgment based thereon. Except for extraordinary circumstances, which have effected a miscarriage of justice, an appellate court should be reluctant to nullify such judgment unless it is clear that one of the parties was responsible for the error, or aided and abetted therein, and that such error was prejudicial. The learned trial judge, who was familiar with all of the circumstances, and who, perhaps, was in better position to sense prejudice, if any, than anyone else, refused to grant a mistrial. The motion for a new trial brought into review the completed case at which time this question recurred because it was specifically assigned as a ground. The court overruled that motion, thereby again holding that the answer of the witness was not sufficient to entitle the appellant to a new trial. On the face of the record this Court can neither say that the answer was prejudicial, nor that the trial judge should have granted the motion for a mistrial.

The appellant complains that the plaintiff's instructions, numbered 5, 6, 7 and 8, were erroneous. As to the first two, the main criticism is that they permitted the jury to find that the motorcycle "had already entered" and "was within the intersection" at the time of the left turn. The main fault, which it claims about the two other, is that the jury was permitted, if they believed from a preponderance of the evidence that the motorcycle was "readily visible" to Riddley, and that it "was within sight of the said Riddley" at the time

that he made the turn, and that Riddley then failed to exercise reasonable care, and such failure was a proximate, contributing cause, etc. The City maintains that both eye-witnesses testified that the motorcycle was not in the intersection and was not visible when the turn was begun, and that the instructions were, therefore, not supported by evidence.

The instructions were based on Section 8196, Code of 1942, Recompiled. That statute forbids the making of a left turn where the vehicle, approaching from the opposite direction "is within the intersection or so close thereto as to constitute an immediate hazard."

The questions here raised go back to the sharply disputed factual issue, represented on the one hand by the maps, the photographs, the physical facts, and the drawings by Riddley of his course of travel, and on the other hand, by the oral testimony of Riddley and Shearer. The jury undoubtedly concluded that Riddley, when he began his turn as he described it, saw, or should have seen, the approaching motorcycle, if he looked; and that it was unreasonable that the motorcycle could have traveled five hundred and fifty or six hundred feet while the truck went only the distance which it traveled in making the turn before being struck. For the reasons heretofore stated, the jury evidently rejected the version of Riddley and Shearer that they looked, and that the motorcycle was not in sight and was not within the intersection or so close thereto as to constitute an immediate hazard. No reversible error is found in these instructions.

The appellant's refused instructions, numbered 10, 11, and 12, were properly refused. The first denied to the jury the right to find for the plaintiff on the basis of negligence for the violation of Section 8189 (b), Code of 1942 Recompiled, and the cited City Ordinance. The second charged peremptorily that Riddley came to a stop; that the plaintiff was not in sight nor was he so close to the intersection as to constitute an immediate

hazard when Riddley started his left turn; that Riddley had the right of way; and that Reed should have yielded the same. The third peremptorily charged the jury that Riddley came to a stop, on approaching the intersection and gave a hand sign for a left turn. Wren did not see such sign, nor would Shearer testify that it was given. Riddley merely said that he stuck his hand out. Besides, no instruction of the plaintiff sought to recover on that ground.

The appellant also contends that the verdict is excessive. It frankly concedes that the plaintiff's injuries were serious, and, that if it was a case of liability, and if the plaintiff was free from negligence, and if the insurance question had not been injected, it would not contend that the verdict is excessive, but it maintains that the plaintiff, at all events, was guilty of gross contributory negligence.

▮▮ ▮ This is a large verdict. The Members of the Court are unaware of the previous approval by this Court of one so large, arising from personal injuries. Neither is the Court aware of any one of its adjudicated cases where the injuries were shown to be worse. The boy's expectancy was 50.1 years. The injuries, as heretofore detailed, were terrible. The appellant asked for and was given an instruction which told the jury that, if they found that the plaintiff was guilty of negligence, "* * * and if you further believe that such negligence, if any, on the part of the plaintiff Roy Reed contributed in any manner and to any extent to the collision and the injuries sustained by the plaintiff Roy Reed, then in fixing the amount of your verdict you will not allow the plaintiff Roy Reed to recover what he would have been entitled to recover had not he himself been guilty of negligence, but you shall reduce his damages and the amount of your verdict in such proportion as Roy Reed's own negligence contributed to the entire negligence involved in the collision.''

Under Section 1455, Code of 1942 Recompiled, all questions of negligence and contributory negligence are for the jury. On this record, the Court cannot say peremptorily that the plaintiff was guilty of contributory negligence, or if so, to what extent that negligence contributed to the collision and the grievous injuries which he sustained. For the determination of this kind of controversy, no means or agency, either equal or superior to the verdict of the jury, has yet been devised. The Court cannot say on this record that the amount of the verdict is so large as to evince passion or prejudice.

Thorough consideration has been given to every feature of the case. No reversible error appears in the record, and the cause must therefore be affirmed.

Affirmed.

*Roberds, P. J.,* and *Hall, Holmes* and *Ethridge, JJ.,* concur.

## APPELLEE'S MOTION TO CORRECT JUDGMENT

The appellee has filed a motion to correct the judgment heretofore entered in this case so as to allow thereon interest at the rate of six per cent, which, under Section 36, Code of 1942 Recompiled, all notes, accounts and contracts may legally bear, and which rate of interest judgments and decrees also bear under Section 39 thereof; and to allow damages in the amount of five per cent, imposed under Section 1971 of the Code when a judgment or decree is affirmed.

In Moore v. Tunica County, 143 Miss. 839, 108 So. 900, the Court had under consideration whether a county, in the absence of a lawful contract, is liable for interest on claims against it. The opinion presumed that the claim there was on account of Section 2678, Code of 1906, now Section 36, supra. It was pointed out that, in Swann v. Turner, 23 Miss. 565, State v. Mayes, 28 Miss. 706, and Whitney v. State, 52 Miss. 732, without the cita-

tion of any authority whatsoever, interest had been allowed. But it was also pointed out that, in Board of Supervisors of Warren County v. Klein, 51 Miss. 807, and Anderson v. Issaquena County, 75 Miss. 873, 23 So. 310, it had been expressly held that interest is a creature of the statute and that *neither the state nor its political subdivisions are liable therefor* unless it is imposed by a statute in which they are specifically named or clearly embraced. The Klein case, supra, and Clay County v. Chickasaw County, 64 Miss. 534, 1 So. 753, were cited as having held that the general statutes on the subject of interest have reference to the contracts of and judgments against individuals, *and not to the contracts of and judgments against the state and its political subdivisions.* Inasmuch as neither the state nor its political subdivisions were mentioned in the statute, it was held that such statutes did not apply to them.

In City of Natchez v. McGehee, 157 Miss. 225, 127 So. 902, it was expressly held that the policeman's judgment for the balance of his salary could not bear interest at six per cent. The opinion pointed out that Section 2678, Code of 1906, now Section 36, supra, was the only authority on which the interest might have been allowed, but that previous decisions had held that this statute does not apply to the state, or to a political subdivision thereof. Inferentially this excluded Section 2680, Code of 1906, now Section 39, Code of 1942 Recompiled, as allowing the payment of interest.

The recent case of Rankin County v. Wallace, Miss., 92 So. 2d 661, held that a county is neither liable, under Sections 36 and 39, supra, for interest, nor under Section 1971, supra, for the five per cent damages because the statutes "do not specifically name or embrace the state or its political subdivisions." It was pointed out that the interest statutes "have reference to the contracts of and judgments against individuals and not to the contracts of and judgments against the state or its political

subdivisions.'' In addition to Moore v. Tunica County, supra, and City of Natchez v. McGehee, supra, the opinion cited Covington County v. Mississippi Road Supply Company, Miss., 59 So. 2d 325, and Moorhead Drainage District v. Pedigo, 210 Miss. 284, 49 So. 2d 378.

In the Pedigo case, supra, interest on the judgment was held not allowable against the drainage district. The opinion said that ''Even less reason exists to extend to such districts the statutory provisions of Section 1971 (Code of 1942) concerning five per cent damages. The latter is a penalty upon an unsuccessful litigant, and has always been strictly construed.'' The Covington County case, supra, allowed interest because it had been lawfully contracted for, but disallowed the five per cent damages for the reason assigned in the Pedigo case.

In the case of Town of Senatobia v. Ryan, 106 Miss. 413, 63 So. 680, cited by the appellee, a contract was involved and the jury, as a part of its verdict, included ''legal interest to date;'' and the judgment, in conformity thereto, provided for interest from the date that the suit was filed. The interest was, therefore, not allowed on a judgment, but as a part of the jury's finding.

Federal Crop Insurance Corporation v. De Cell, 222 Miss. 643, 76 So. 2d 826, also cited by the appellee, is not in point because the appellant there, while a creature of and chartered by the United States of America, was certainly not a political subdivision of the State of Mississippi.

In State Highway Commission v. Mason, 192 Miss. 576, 4 So. 2d 345, both interest and damages were allowed. The similarity in that case with the use of the right of eminent domain was emphasized and the Court followed the reasoning in Deneen v. Unverzagt, 225 Ill. 378, 80 N. E. 321, 8 Ann. Cas. 396.

██ ██ The past decisions of this Court seem to make it perfectly clear that a political subdivision of the state, in the absence of a contract which provides for the pay-

ment of interest, is not liable for interest on a judgment or decree against it, under the statutes mentioned; and is not liable, under such statutes, for the five per cent damages. These principles are well established in the jurisprudence of this state and this Court declines to overrule those decisions.

The City of Jackson is a political subdivision of the state and is not liable on this judgment either for interest or damages.

From which it follows that the motion to correct the judgment must be, and is, overruled.

Overruled.

All Justices concur.