IN THE SUPREME COURT OF MISSISSIPPI
NO. 98-CA-00040-SCT

*MISSISSIPPI TRANSPORTATION COMMISSION*

*v.*

*RONALD ADAMS CONTRACTOR, INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/06/1997 |
| TRIAL JUDGE: | HON. ROBERT LEWIS GIBBS |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | TERRY R. LEVY |
| | JAMES J. CRONGEYER |
| | JOHN MARSHALL LUSK, JR. |
| | RICHARD E. WILBOURN, II |
| | JOHN L. GADOW |
| ATTORNEYS FOR APPELLEE: | PHIL B. ABERNETHY |
| | RICHARD M. DYE |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED ON DIRECT APPEAL; REVERSED ON CROSS-APPEAL-02/17/2000 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 3/9/2000 |

## BEFORE SULLIVAN, P.J., SMITH AND MILLS, JJ.

## SMITH, JUSTICE, FOR THE COURT:

### STATEMENT OF THE CASE

¶1. In February of 1995, Ronald Adams Contractor, Inc. ("Adams") was awarded a contract by the Mississippi Transportation Commission ("the Commission") for a highway improvement construction project on Mississippi Highway 16 in Neshoba County, Mississippi. The contract documents prepared by the Commission contained a date by which the Commission was to issue the Notice to Proceed.[(1)] The Commission did not issue the Notice to Proceed until eighty-six days after the date indicated in the contract. On May 20, 1996, Adams instituted this suit in the Circuit Court of the First Judicial District of Hinds County, Mississippi, against the Commission for damages allegedly incurred as a result of the delay. The Commission filed a motion for summary judgment on the grounds that the contract was unambiguous and a

matter for determination by the court rather than the jury. The Commission argued in its motion for summary judgment that the date specified for the issuance of the Notice to Proceed was merely an anticipated date and that "no damage for delay" clauses prevent Adams from receiving anything more than an extension of the completion date. The circuit court judge, the Honorable Robert L. Gibbs, denied the motion on the grounds that the contract was ambiguous and therefore a matter of determination for the jury.

¶2. The case proceeded to a trial on the merits. At the close of Adams's case-in-chief, the Commission moved for a directed verdict, again arguing that, as a matter of law, the Commission did not breach the contract because the date specified for the issuance of the Notice to Proceed was merely an anticipated date and that "no damage for delay" clauses prevent Adams from receiving monetary damages. The trial judge denied the motion on the grounds that the contract was ambiguous.

¶3. At the close of all evidence, the jury awarded a judgment against the Commission in the amount of $387,923. On November 6, 1997, the circuit court entered final judgment in favor of Adams. The Commission filed motions for judgment notwithstanding the verdict and, alternatively, for a new trial, both of which were denied by the circuit court on November 24, 1997. Adams filed a motion for pre-judgment interest, which was also denied by the circuit court.

¶4. The Commission timely filed a notice of appeal with this Court on December 19, 1997, assigning error to the trial court's refusal to grant the Commission's motion for summary judgment, motion for directed verdict, motion for judgment notwithstanding the verdict, and motion for new trial. The Commission also argues that the jury's verdict is contrary to the law and contrary to the evidence. Adams filed a notice of cross-appeal from the circuit court's order denying its motion for pre-judgment interest on January 2, 1998, but withdrew the request in light of this Court's recent holding in ***[City of Jackson v. Williamson](), 740 So. 2d 818 (Miss. 1999)***. Adams now requests post-judgment interest and the statutory appeal penalty.

## STATEMENT OF FACTS

¶5. In February of 1995, the Commission published advertisements for bids on a highway improvement construction project on Mississippi Highway 16 in Neshoba County, Mississippi ("the project"). Generally, the project entailed expanding a 1.5 mile stretch of two-lane highway into a four-lane highway.

¶6. Adams submitted its bid proposal on the project and was awarded the contract on February 28, 1995. By letter from Billy Key, contract administration engineer for the Commission, dated March 1, 1995, the Commission notified Adams that it had submitted the low bid and was chosen to be the contractor for the project. The letter instructed Adams that it should complete the proposal and contract documents, which Adams had received from the Commission prior to submitting its bid, by March 20, 1995. On March 15, 1995, Adams signed the proposal and contract documents and forwarded them to the Commission.

¶7. Prior to Adams's submitting its bid for the project, the Commission provided Adams with a copy of bid documents, which contained the plans and specifications for the project as well as the contract documents (hereinafter "proposal and contract documents"). The proposal and contract documents state that the Notice to Proceed would be issued by May 8, 1995. The documents also contain a document entitled "Utility Certification," which states that all arrangements had been made for the removal of all utilities from the right-of-way and, specifically, that the water line which traversed the project would be relocated by May 6, 1995, two days prior to the date the Notice to Proceed was to be issued.

¶8. Incorporated by reference into the proposal and contract documents is the 1990 edition of the <u>Mississippi Standard Specifications for Road and Bridge Construction</u> ("the Red Book"). The Red Book contains a series of standard clauses and conditions that apply to all Commission contracts. The Commission has the right to modify for a particular project anything that is in the Red Book by placing the modification in the bid documents. The document entitled "Governing Specifications" states that the Red Book is made a part of the contract "except where superseded by special provisions . . ." in the proposal and contract documents. It is undisputed that the contract between the parties consists of the proposal and contract documents, the Red Book, and the project plans.

¶9. On April 13, 1995, the Commission informed Adams's contract administrator that there were some problems with the right-of-ways. Though there were several utilities involved, the delay was caused by a water line located over sixty percent of the right lane of the highway project, which prevented the excavation and movement of dirt necessary to construct the highway. Nevertheless, Billy Key, contract administrator for the Commission, told Adams he was still optimistic the full Notice to Proceed could issue by May 8, 1995. However, on May 8, 1995, at the preconstruction conference, the Commission informed Adams that the right-of-way would not be cleared by the date stated in the Utility Certification and that it would be the end of June, 1995, before the Adams could have access to the entire project. The Commission offered to allow Adams to proceed on a Restricted Notice to Proceed basis.[2] Adams declined this option and indicated it wished to proceed with the contract as originally agreed.

¶10. Ronald Adams testified that his company decided against proceeding upon a Restricted Notice to Proceed due to the increased costs and lack of practicality attendant in doing so. Thomas Hymel, bid estimator and project manager for Adams, testified that it was not economical to proceed on a Restricted Notice because of the loss in efficiency which would be incurred by working on only forty-five percent of the right lane and the attendant increase in costs, which would have to be absorbed by Adams. Ronald Adams testified that by the time his company had notice of the possible delay, the manpower and equipment required for the job were already mobilized and committed, and some equipment was already on site. Furthermore, Ronald Adams testified that because the delay was only "possible" and because Adams was required to begin construction promptly upon receiving the Notice to Proceed, Adams had to keep its crews and equipment ready and mobilized, rather than committing them to other jobs in the meantime. Adams placed crews and equipment on standby during the delay. Adams informed the Commission by letter dated June 1, 1995, that it was incurring costs due to the delay for which it expected to be compensated and requested an extension of time to complete the project as well as compensation for additional costs incurred.[3]

¶11. The Notice to Proceed was not issued until August 2, 1995, eighty-six days after the date indicated in the contract. Adams began construction on August 9, 1995. Because of the delay in the issuance of the Notice to Proceed, the Commission extended the completion date for the project to April 24, 1997. The letter from the Commission to Adams, which constituted the Notice to Proceed and which extended the completion date, states, "If the time revision does not meet with your approval, please notify this office immediately so that we can start procedures necessary to rescind the award and release your [sic] from this contract." Ronald Adams testified that he did not request that Adams be released from the contract because the time revision was adequate and because the company had already committed equipment and personnel for the job. Ronald Adams testified that the 86-day delay in issuing the Notice to Proceed extended the contract 222 days at the end of the job because the revised schedule added a second winter to the job and because of the different time frames posed by the new schedule. On May 20, 1996, Adams brought suit for

damages allegedly sustained by the delay in the Circuit Court of the First Judicial District of Hinds County, Mississippi.

¶12. The Commission filed a motion for summary judgment with the circuit court, arguing that the date specified in the contract for issuance of the Notice to Proceed was merely anticipated and its failure to issue the Notice to Proceed on that date was thus not, as a matter of law, a breach of contract. The Commission also argued that, even if the Commission's failure to meet the specified date were a breach, Adams is not entitled to damages, but only an extension of contract time, pursuant to two "no damage for delay" clauses contained in the Red Book. The Commission argued that the contract was clear and without ambiguity on both issues. At close of Adams's case-in-chief, the Commission raised its motion for directed verdict, asserting the same arguments it made in its motion for summary judgment. In denying both motions, the trial court found that the contract was ambiguous, and therefore a matter of determination for the jury.[(4)]

¶13. The jury returned a verdict for Adams, awarding Adams $387,923 in damages. The Commission filed motions for judgment notwithstanding the verdict and, alternatively, for new trial, both of which were denied by the circuit court. Adams filed a motion for pre-judgment interest, which was also denied by the trial court.

¶14. Aggrieved, the Commission filed a timely appeal to this Court, assigning error to the trial court's refusal to grant the Commission's motion for summary judgment, motion for directed verdict, motion for judgment notwithstanding the verdict, and motion for new trial. Adams filed a notice of cross-appeal from the circuit court's order denying its motion for pre-judgment interest on January 2, 1998, but withdrew the request in light of this Court's recent holding in ***City of Jackson v. Williamson***, 740 So. 2d 818 (Miss. 1999). Adams now requests post-judgment interest and the statutory appeal penalty. The Commission raises the following issues:

> **I. THE TRIAL JUDGE ERRED IN ALLOWING THE JURY TO DETERMINE WHETHER THE DATE SPECIFIED IN THE CONTRACT ON WHICH THE NOTICE TO PROCEED WAS TO BE ISSUED IS MERELY AN ANTICIPATED DATE.**
>
> **II. THE TRIAL JUDGE ERRED IN ALLOWING THE JURY TO DETERMINE WHETHER ADAMS IS PRECLUDED FROM RECOVERING DAMAGES BY THE "NO DAMAGE FOR DELAY" PROVISIONS CONTAINED IN THE RED BOOK.**
>
> **III. THE TRIAL JUDGE ERRED IN DENYING THE COMMISSION'S MOTION FOR DIRECTED VERDICT AND MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT.**
>
> **IV. THE TRIAL JUDGE ERRED IN DENYING THE COMMISSION'S MOTION FOR NEW TRIAL.**
>
> **V. ADAMS IS NOT ENTITLED TO AN AWARD OF POST-JUDGMENT INTEREST NOR THE STATUTORY APPEAL PENALTY.**

## STANDARD OF REVIEW

### Denial of Motion for Summary Judgment

¶15. Summary judgment may be granted only where there are no genuine issues of material fact such that the moving party is entitled to judgment as a matter of law. Miss. R. Civ. P. 56(c). A motion for summary judgment should be denied unless the trial court finds, beyond any reasonable doubt, that the plaintiff would be unable to prove any facts to support his claim. *Yazoo Properties v. Katz & Besthoff No. 284, Inc.*, 644 So. 2d 429, 431 (Miss. 1994) (citing *McFadden v. State*, 580 So. 2d 1210 (Miss. 1991)). This Court conducts a de novo review of the record on appeal from the lower court's grant of summary judgment. *Aetna Cas. & Sur. Co. v. Berry*, 669 So. 2d 56, 70 (Miss. 1996); *Pace v. Financial Sec. Life of Mississippi*, 608 So. 2d 1135 (Miss. 1992). Evidentiary matters are viewed in the light most favorable to the non-moving party. *Palmer v. Biloxi Reg'l Med. Ctr., Inc.*, 564 So. 2d 1346, 1354 (Miss. 1990). If any triable issues of fact exist, the lower court's decision to grant summary judgment will be reversed. Otherwise, the decision should be affirmed. *Brown v. Credit Ctr., Inc.*, 444 So. 2d 358, 362 (Miss. 1983).

### Denial of Motion for Directed Verdict and

### Denial of Motion for Judgment Notwithstanding the Verdict

¶16. The standard of review for the denial of a motion for directed verdict and a motion for judgment notwithstanding the verdict are identical. *Steele v. Inn of Vicksburg, Inc.*, 697 So. 2d 373, 376 (Miss. 1997). This Court will consider the evidence in the light most favorable to the appellee, giving the appellee the benefit of all favorable inferences that may be reasonably drawn from the evidence. *General Motors Acceptance Corp. v. Baymon*, 732 So. 2d 262, 268 (Miss. 1999) (citing *Steele*, 697 So.2d at 376). If the facts are so overwhelmingly in favor of the appellant that reasonable jurors could not have arrived at a contrary verdict, this Court must reverse and render. *Id.* On the other hand, if there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, this Court must affirm. *Id.*

### Denial of Motion for New Trial

¶17. When determining whether a trial court erred in refusing a new trial, this Court reviews for abuse of discretion. *Lewis v. Hiatt*, 683 So. 2d 937, 941 (Miss. 1996).

### DISCUSSION OF LAW

### I. THE TRIAL JUDGE ERRED IN ALLOWING THE JURY TO DETERMINE WHETHER THE DATE SPECIFIED IN THE CONTRACT ON WHICH THE NOTICE TO PROCEED WAS TO BE ISSUED IS MERELY AN ANTICIPATED DATE.

¶18. The Commission argues that because the contract unambiguously states that the project start dates contained in the contract are merely anticipated dates, the Commission did not breach its contract with Adams as a matter of law. The Commission relies on § 108.02 of the Red Book, which states:

> The Contractor shall not begin construction on any feature of the work before a Notice to Proceed is issued. The anticipated dates of the Notice to Proceed and the beginning of Contract Time will be specified in the proposal. . . . If Circumstances delay the issuance of the Notice to Proceed, the Beginning of Contract Time will automatically be adjusted equal to the number of calendar days of the delay. . . . The specified completion date will be extended automatically as provided in 108.06, and the Department will furnish the Contractor a revised progress schedule as provided in 108.03.1 . . . .

Failure of the Contractor to commence work by the date specified for the beginning of contract time or within a reasonable time thereafter may be cause for annulment of the contract.

(emphasis added). The Commission contends that because this provision unambiguously states that the project start dates are anticipated dates, there was no guarantee that the Notice to Proceed would be issued on May 8, 1995. The Commission argues that its failure to issue the Notice to Proceed by May 8, 1995, was not, as a matter of law, a breach of contract, and that the jury was not entitled to determine whether the Commission breached its contract with Adams.

¶19. Adams urges this Court to apply the doctrine of *ejusdem generis*, the notion that specific language controls over general inconsistent language in a contract, to find that the document which contains the project start dates applies exclusively to the situation at hand. Specifically, Adams points to the document entitled "Governing Specifications," contained in the proposal and contract documents, which states that the Red Book is made a part of the contract "except where superseded by special provisions. . . ." Adams argues that the following is such a provision, drafted specifically by the Commission for the contract with Adams:

"The calendar date for completion of work to be performed by the Contractor for this project shall be September 13, 1996 which date or extended date as provided in Subsection 108.06 shall be the end of contract time. Except as therein provided, the Notice to Proceed will be issued by not later than May 8, 1995 and the date for beginning of contract time will be May 15, 1995."

Adams contends this provision trumps any conflicting Red Book provision and establishes that the project start date was not merely an anticipated date.

¶20. This Court has recognized that the cardinal rule of construction of a contract is to ascertain the mutual intentions of the parties. *Hoerner v. First Nat'l Bank of Jackson*, 254 So. 2d 754, 759 (Miss. 1971) (citing *Rubel v. Rubel*, 221 Miss. 848, 75 So. 2d 59 (1954)). Intent should first be sought in an objective reading of the words employed in the contract. *Cooper v. Crabb*, 587 So. 2d 236, 239, 241 (Miss.1991). "[T]he court's concern is not nearly so much with what the parties may have intended, but with what they said, since the words employed are by far the best resource for ascertaining the intent and assigning meaning with fairness and accuracy." *Warwick v. Gautier Utility Dist.*, 738 So. 2d 212, 215 (Miss. 1999) (citing *Simmons v. Bank of Mississippi*, 593 So. 2d 40, 42-43 (Miss.1992)).

¶21. The trial judge correctly found that the conflict created by the above provisions creates ambiguity and that there thus existed an issue of fact as to whether the Commission breached its contract with Adams by failing to issue the Notice to Proceed on the date specified in the contract documents. The language of the contract provision cited by Adams is clear:

"The calendar date for completion of work to be performed by the Contractor for this project **shall be** September 13, 1996 which date or extended date as provided in Subsection 108.06 shall be the end of contract time. **Except as therein provided**, the Notice to Proceed will be issued **by not later than** May 8, 1995 and the date for beginning of contract time will be May 15, 1995."

(emphasis added). The phrase "[e]xcept as therein provided" clearly refers to subsection 108.06 of the Red Book. Subsection 108.06 contains only provisions regarding the determination of the completion date of the contract and the extension of the completion date for delay in progress caused by conditions beyond the

contractor's control. Subsection 108.06 contains no mention of a change in the date set for the issuance of the Notice to Proceed or the date specified as the beginning of contract time. The subsection speaks from the assumption that the Notice to Proceed and project start date have already been set, or even passed, and calculates the time for construction from that set point. A change in the Notice to Proceed date and project start date are not contemplated by subsection 108.06. Thus, the reader is left only with the plain language of the quoted provision, which states that the Notice to Proceed will be issued and the project started at a date "not later than" the dates provided.

¶22. The provision relied upon by the Commission, § 108.02, conflicts with the provision reciting the project start dates. Aside from referring to the dates for the issuance of the Notice to Proceed and the beginning of contract time as "anticipated dates," the provision seems to contemplate the possibility of a delay in the issuance of the Notice to Proceed and the need to adjust the dates accordingly with the statement, "If Circumstances delay the issuance of the Notice to Proceed, the Beginning of Contract Time will automatically be adjusted equal to the number of calendar days of the delay." The provision runs head long into the specific provision in the contract between the Commission and Adams containing the dates for issuance of the Notice to Proceed and the beginning of contract time.

¶23. The result is an inconsistency in the language employed in a provision drafted by the Commission for the specific project at hand and the recital of standard specifications incorporated by reference into the contract. The ambiguity is to be construed in favor of Adams for two reasons. First, it is a well-known canon of contract construction that ambiguities in a contract are to be construed against the party who drafted the contract. *Estate of Parker v. Dorchak*, 673 So. 2d 1379, 1381-82 (Miss. 1996) (citing *Pursue Energy Corp. v. Perkins*, 558 So. 2d 349 (Miss.1990)). The Commission prepared the proposal and contract documents supplied to Adams and incorporated by reference all provisions of the Red Book.

¶24. Second, as Adams submits, special provisions inserted in a contract govern over boilerplate provisions. *Dorchak*, 673 So. 2d at 1382. Adams urges this Court to apply the doctrine of *ejusdem generis*, the notion that specific language controls over general inconsistent language in a contract, to find that the specific provision containing the project start dates overrides the general language of the standard specifications contained in the Red Book. *Garrett v. Hart*, 250 Miss. 822, 834, 168 So. 2d 497, 503 (1964) (citing *Williams v. Batson*, 186 Miss. 248, 187 So. 236, 239 (1939)). The doctrine of *ejusdem generis* applies only when the contract is found to be ambiguous. *Yazoo Properties v. Katz & Besthoff No. 284, Inc.*, 644 So. 2d 429, 432 (Miss. 1994) (citing *Cole v. McDonald*, 236 Miss. 168, 109 So.2d 628 (1959)). Here, the trial judge correctly found that the conflict between the specific agreement between the Commission and Adams and the Red Book provision incorporated by reference results in ambiguity. The Red Book contains general, boilerplate specifications which apply to all contracts of the Commission. The contract at hand was entered into between the Commission and Adams specifically for the project at hand. Applying the doctrine of *ejusdem generis*, this Court holds that the provisions of the contract drafted specifically by the Commission for this project supplant any inconsistent general provisions found in the Red Book and incorporated by reference.

¶25. As Adams submits, the language of the contract between the parties demands this same result. The document entitled "Governing Specifications," contained in the proposal and contract documents, states that the Red Book is made a part of the contract "except where superseded by special provisions. . . ." Not only is the provision regarding the project start dates a detailed provision relating specifically to the project

at hand, but the Commission also drafted a provision regarding the time period in which the utilities on the right-of-way would be relocated. That document, entitled "Utility Certification," states:

> This is to certify that all necessary arrangements have been made for utility relocation work to be undertaken and completed. As noted above, actual relocation work cannot be completed until all highway right-of-way has been acquired.

With regard to the water line which was the predominant cause of the delay, the certification states:

> Central Water Association
>
> Utility Agreements approved.
>
> Contract for relocation work is advertised.
>
> Bids to be received February 13, 1995.
>
> Pending MDOT concurrence, contract to be awarded and work order issued.
>
> Work to begin March 6, 1995.
>
> Work to be completed (60 days) May 6, 1995.

¶26. Neither the trial judge nor this Court has been asked to determine whether the Commission's failure to comply with the project start dates contained in the contract between the Commission and Adams constituted a breach of that contract. The trial court was required by the Commission's motion for summary judgment to determine only whether, according to the provisions of the contract, the Commission did not breach the contract as a matter of law. The trial judge found that the conflicting provisions are ambiguous and that there is thus an issue of fact as to whether the Commission breached the contract. The trial judge correctly allowed Adams to move beyond summary judgment to attempt to prove the meaning of the conflicting provisions and to attempt to prove that the Commission's failure to issue the Notice to Proceed on May 8, 1995, constituted a breach of contract. The Commission was certainly allowed to counter with its own evidence in opposition to Adams's interpretation of the contract provisions.

## II. THE TRIAL JUDGE ERRED IN ALLOWING THE JURY TO DETERMINE WHETHER ADAMS IS PRECLUDED FROM RECOVERING DAMAGES BY THE "NO DAMAGE FOR DELAY" PROVISIONS CONTAINED IN THE RED BOOK.

¶27. In its motion for summary judgment, the Commission argued that the "no damage for delay" provisions found in §§ 105.06 and 107.04 of the Red Book prevent Adams from recovering monetary damages and that, pursuant to these provisions, Adams's remedy is limited to an extension of time in which to complete the project. In denying the Commission's motion for summary judgment, the trial judge held that the contract is ambiguous as to the application of the "no damage for delay" clauses to a delay in the issuance of the Notice to Proceed. On appeal, the Commission argues that because the clauses unambiguously apply to the situation at hand, it was error to submit the issue of their applicability to the jury and for the jury to award damages in the amount of $387,923.

¶28. Section 105.06 of the Red Book provides:

> Cooperation with Utilities.
>
> . . . . All utility appurtenances are to be relocated or adjusted by others unless provided otherwise in the contract.
>
> All known utilities within the project are shown on the plans. It is understood and agreed that the Contractor has considered in his bid all of the utility appurtenances in their present or relocated positions and that <u>no additional compensation will be allowed for delays, inconvenience, or damage sustained by him due to interference from the said utility appurtenances or the operation of moving them</u>. The Engineer's determination that removing, relocating, or adjusting of utility appurtenances or failure of others to do so is causing a delay in major phrases of construction which normally should be in progress will be considered a delay by the State in the determination of extension of contract time. In the event the utility owners fail to comply with their responsibility in relocating or adjusting their facilities, the Engineer may require the Contractor to make adjustments as extra work.

(emphasis added).

¶29. Section 107.04 of the Red Book provides:

> Restoration of Surfaces Opened by Permit.
>
> The right to construct or reconstruct any utility service in the highway or street or to grant permits for the same, at any time, is expressly reserved by the Department. <u>The Contractor will not be entitled to any damages from the Department for delays or damages due to utility construction or reconstruction by a third party except an adjustment in contract time will be allowed when the Engineer determines a delay prevents the performance of the controlling phase(s) of work</u>.

(emphasis added).

¶30. Courts have traditionally held that "no damages for delay" provisions are valid and enforceable. ***E.C. Ernst, Inc. v. Manhattan Constr. Co. of Texas***, 551 F.2d 1026, 1029 (5th Cir. 1977) (holding that "no damages for delay" clauses will generally be enforced absent a delay not contemplated by the parties, amounting to an abandonment of the contract, caused by bad faith, or amounting to active interference)). This Court has held that such clauses are enforceable, but are to be strictly construed against those who seek their benefit. *Mississippi Transp. Comm'n v. SCI, Inc.*, 717 So. 2d 332, 338 (Miss. 1998).

¶31. Adams argues that §§ 105.06 and 107.04 do not apply to a delay in issuing the Notice to Proceed. Adams argues that these two sections do not contemplate a delay in the issuance of the Notice to Proceed, but apply only where delay is caused by interference from utilities after the contractor has begun work. Adams argues that §§ 105.06 and 107.04 could apply if Adams had been given a Notice to Proceed, had begun construction work, and if, while proceeding with the work, was required to work around the presence of utilities on the right-of-way. Adams submits that because it never went to work in the first place, it did not suffer the interference contemplated by §§ 105.06 and 107.04. Rather, Adams submits that a delay in issuing the Notice to Proceed is directly addressed by § 108.02 of the Red Book, which provides:

> Notice to Proceed. The Contractor shall not begin construction on any feature of the work before a Notice to Proceed is issued. The anticipated dates of the Notice to Proceed and the Beginning of

Contract Time will be specified in the proposal. . . <u>If circumstances delay the issuance of the Notice to Proceed, the Beginning of Contract Time will automatically be adjusted equal to the number of calendar days of the delay. . . The specified completion date will be extended automatically as provided in 108.06, and the Department will furnish the Contractor a revised progress schedule as provided in 108.03.1</u>. . . Failure of the Contractor to commence work by the date specified for the beginning of contract time or within a reasonable time thereafter may be cause for annulment of the contract.

(emphasis added). Adams argues that because this section, which deals specifically with delays in the issuance of the Notice to Proceed, does not contain its own "no damage for delay" clause, such demonstrates that the Commission did not intend that the "no damage for delay" provision apply to a delay in the issuance of the Notice to Proceed. Adams argues that under the doctrine of *ejusdem generis*, the specific provision should control the general -- that is, because § 108.02 applies specifically to delays in issuance of the Notice to Proceed, it applies to the exclusion of §§ 105.06 and 107.04.

¶32. When a contract is unambiguous, determining its meaning is a question of law for the court to decide, and the contract must be enforced as written. *Griffin v. Tall Timbers Dev., Inc.*, 681 So. 2d 546, 551 (Miss. 1996) (citing *Pfisterer v. Noble*, 320 So.2d 383, 384 (Miss.1975)). Like all contractual provisions, a "no damage for delay" clause is open to construction only if it is ambiguous. Mere disagreement about the meaning of the contract does not make it ambiguous. *Simmons v. Bank of Mississippi*, 593 So. 2d 40, 43 (Miss. 1992) (citing *Cherry v. Anthony*, *Gibbs, Sage*, 501 So.2d 416, 419 (Miss.1987)).

¶33. Considering only the language of the above provisions, there exists no ambiguity. Sections 105.06 and 107.04 do not, by their language, limit themselves to application only where the contractor has commenced work on the project. The fact that the language of these two provisions sweeps broadly does not make them vague. The language clearly provides that there shall be no monetary damages for delays due to "utility construction or reconstruction" or "interference from the said utilities or the operation of moving them."

¶34. Furthermore, the fact that § 108.02 deals specifically with a delay in the issuance of the Notice to Proceed does not mean that the "no damage for delay" provisions do not apply to such a situation. It is undisputed that the Notice to Proceed was not issued because of a delay in the relocation of certain utility lines. Adams makes much of the fact that § 108.02 does not include its own "no damage for delay" clause. Such language should not be necessary when §§ 105.06 and 107.04 cover all necessary bases with clear, though broadly sweeping, language. As this Court has stated, the doctrine of *ejusdem generis* has no application where there is no ambiguity. *Yazoo Properties v. Katz & Besthoff No. 284 Inc.*, 644 So. 2d 429, 432 (Miss. 1994) (citing *Cole v. McDonald*, 236 Miss. 168, 109 So.2d 628 (1959)).

¶35. However, though there is no issue of fact as to whether the "no damage for delay" clauses apply to a delay, caused by utilities, in the issuance of the Notice to Proceed, there is an issue of fact as to whether any of the four exceptions to the application of "no damage for delay" clauses discussed below and recognized by this Court in *Mississippi Transp. Comm'n v. SCI, Inc.*, 717 So. 2d 332 (Miss. 1998), operate to preclude the application of the clauses. If applicable, any of these exceptions would preclude operation of the clauses, even if the clauses unambiguously apply to the situation at hand.

¶36. This Court first addressed "no damage for delay" clauses in the context of a public contract in *Edward E. Morgan Co. v. State Highway Comm'n*, 212 Miss. 504, 54 So. 2d 742 (1951). In that case,

Edward E. Morgan, under contract for construction work on part of a highway, sued the Mississippi State Highway Commission for loss of use or rental of construction equipment rendered idle because of the Commission's failure to arrange for prompt removal of electric poles along the construction route. At issue was § 22.02 of the 1940 edition of the Red Book, which stated:

> Buildings, structures, fences, pipe lines, and other public utilities and private improvements, that would interfere with the construction and which are to be removed by the owners or the State, will not be held as a charge or responsibility of the Contractor except that the Contractor waives any and all claims for interference, delay, or damage on account of their removal or non-removal.

The Court held that § 22.02 precluded the jury's award of damages.

¶37. This Court recently revisited the issue of "no damage for delay" clauses in ***Mississippi Transp. Comm'n v. SCI, Inc.*, 717 So. 2d 332 (Miss. 1998).** In that case, SCI was awarded a contract to construct improvements to a Highway 603 in Hancock County. SCI brought a breach of contract action against the Commission when its operations were rendered less efficient and more costly because it had to work around utility conflicts which were to be removed prior to construction. The jury returned a verdict in favor of SCI and awarded monetary damages. The Commission appealed, arguing, inter alia, that SCI was not entitled to recover damages pursuant to the "no damage for delay" clause of § 105.06. This Court stated:

> [E]ven with a "no damages for delay" clause, many jurisdictions have determined that damages may be recovered for any delay that: (1) was not intended or contemplated by the parties to be within the purview of the provision; (2) resulted from fraud, misrepresentation, or bad faith on the part of one seeking the benefit of the provision; (3) has extended such an unreasonable length of time that the party delayed would have been justified in abandoning the contract; or (4) is not within the specifically enumerated delays to which the clause applies.

717 So. 2d at 338 (citing ***Green Int'l, Inc. v. Solis***, 951 S.W.2d 384 (Tex. 1997); ***United States v. Metric Constructors, Inc.***, 480 S.E.2d 447, 448 (S.C. 1997); ***J&B Steel Contractors, Inc. v. C. Iber & Sons, Inc.***, 642 N.E.2d 1215, 1221 (Ill. 1994)).

¶38. In ***SCI***, the Commission submitted a jury instruction which tracked the previously listed exceptions. This Court held that the jury's verdict and award of damages implicitly established that the "no damages for delay" provision did not bar the recovery of monetary damages in this case. ***Id.*** at 339. The Court stated that the Commission's refusal to grant extensions to SCI on a timely basis could reasonably be interpreted as active interference or bad faith and would justify the damages award under the second exception listed above. ***Id.***

¶39. In the case at hand, Adams argues that even if the "no damages for delay" provisions apply to the delay in the issuance of the Notice to Proceed, all four exceptions listed by the Court in ***SCI*** potentially apply, creating an issue of fact as to whether the "no damages for delay" provisions operate to preclude a damages award. First, Adams contends that a three-month delay in the issuance of the Notice to Proceed was not within the contemplation of the parties at the time the contract was executed. Second, Adams contends that the Commission misrepresented the status of the utility relocation in the utility certification. As to the third exception, Adams argues that a delay of approximately three months is unreasonable and would have justified abandonment of the contract. As to the fourth exception, Adams contends that the delay in the

issuance of the Notice to Proceed is not a delay contemplated by the "no damages for delay" provisions. As discussed above, the delay in the issuance of the Notice to Proceed is a delay to which the "no damages for delay" provisions apply. Thus, the fourth exception does not apply in this case. However, as to the first, second and third exceptions, there existed issues of fact to be properly resolved by the jury.

¶40. The Commission, in turn, argues that the four exceptions listed in *SCI* were never adopted by this Court in *SCI* and that, unlike the situation in *SCI*, Adams, not the Commission, submitted the instruction ultimately presented to the jury which included the four exceptions. The Commission's argument is misplaced. First, though this Court did not explicitly state in *SCI* that it adopted the enumerated exceptions, it recognized the existence of those exceptions in other jurisdictions and let stand a jury verdict clearly premised on the jury's application of one of those exceptions. Second, it can hardly be said that the Court's decision in *SCI* turned on which party had submitted the instruction to the jury which included the four exceptions. In the case at bar, though Adams's counsel ultimately submitted the instruction regarding the four exceptions, the Commission's counsel had submitted a similar instruction which it later withdrew. The Commission's counsel stated in withdrawing the instruction:

> The way this instruction was drafted was that we, under our theory - you should tell them that the clause applies and that the factual issues would be these exceptions. We have another instruction later on, since you said you're not going to do that, saying that this clause applies. And if [plaintiff's counsel] wants to put in an instruction about what the exceptions are, we think that's for [plaintiff's counsel] to do.

Adams's counsel at that time submitted the instruction as its own. The Commission's counsel made no objection. This issue is without merit.

### III. THE TRIAL JUDGE ERRED IN DENYING THE COMMISSION'S MOTION FOR DIRECTED VERDICT AND MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT

¶41. In appealing the trial court's denial of the Commission's motion for directed verdict and motion for judgment notwithstanding the verdict, the Commission argues, essentially, that the evidence was insufficient to support a determination by the jury that the Commission breached its contract with Adams by failing to issue the Notice to Proceed on the date specified in the contract and that Adams is entitled to monetary damages despite the "no damages for delay" clauses in the contract.

¶42. Contrary to the Commission's assertions, there is substantial evidence in support of the jury's verdict. Aside from the presentation of the contract provisions discussed above to the jury, testimony regarding each party's interpretation of those provisions was presented. Regarding the jury's determination that the Commission breached its contract with Adams by failing to issue the Notice to Proceed on the date specified in the contract, the following evidence was before the jury. Ronald Adams, president and owner of Adams, and Thomas Hymel, bid estimator and project manager for Adams, testified at trial to Adams's reliance on the dates specified in the proposal and contract documents in estimating a bid. Thomas Hymel explained, "These bid documents are really the Bible to us. . . . We rely totally upon the accuracy of the information that's in these documents. My bid is only as good as that accuracy." Both Ronald Adams and Thomas Hymel testified regarding the importance of and their reliance on the Utility Certification. Ronald Adams explained the importance of accurate scheduling in the preparations to commit equipment and crews to a job site. Robert Gregory, accepted by the court as an expert witness on the calculation of delay costs,

testified on Adams's behalf regarding the costs incurred as a result of the delay in the issuance of the Notice to Proceed as well as the increased expense and decreased efficiency born by a contractor under a Restricted Notice to Proceed.

¶43. The following significant exchange took place between Adams's counsel and Billy Key, contract administration engineer for the Commission, on cross-examination:

Q. So when the Highway Department prepares a bid document for a particular project, they have the right to modify or clarify or amplify on anything that's in the red book?

A. Yes, sir.

Q. And the bid documents for a particular project may be more specific to that project than the rules that are in the red book?

A. Yes, sir.

Q. And if the Highway Department was going to be specific or modify something that's in the red book for a particular project where they would put that modification would be in the bid documents?

A. Yes, sir.

. . . .

Q. If you would, Mr. Key, turn to the part of the bid documents that's labeled page 35 at the bottom.

A. Okay.

Q. It's called "Contract Time," isn't it?

A. Yes, sir.

Q. It says for the Highway 16 project that the completion date will be September 13, 1996; is that right?

A. Yes, sir.

Q. Does it say that the Notice to Proceed will be issued not later than May 8th, 1995?

A. Yes, sir.

Q. Now, this was a clause that was inserted in the Highway 16 project, especially for that project, isn't it?

A. Yes, sir.

. . . .

Q. When that came out in the bid documents, you expected the contractors who were bidding the job to factor that in and use that as part of the information that they bid the job on, didn't you?

A. Yes, sir.

Q. You expected the highway contractors who bid this job to rely on the fact that the Notice to Proceed would be issued no later than May 8th?

A. Yes, sir.

. . . .

Q. There was nothing in the bid documents for the project you're holding in your hand, is it, Mr. Key, that would have notified bidding contractors that there was a potential for the Notice to Proceed not to be issued?

A. No, Sir.

¶44. There was also substantial evidence from which the jury could have concluded that the "no damage for delay" provisions do not bar Adams's recovery for the delay because of the existence of one of the four exceptions to the application of "no damage for delay" provisions. Regarding the first exception, that damages may be recovered for any delay that was not intended or contemplated by the parties to be within the purview of the provision, testimony was presented to the jury that a three-month delay in the issuance of the Notice to Proceed was not contemplated by the parties. The following exchange occurred between Adams's counsel and Billy Key:

Q. Now, Mr. Key, when you sent out the bid documents for this project, when the Highway Department did, when you open the bids on February 28th, when you sent Mr. Adams his contract on March 1, when you got it back on March 15, on none of those dates was it in your contemplation that the Notice to Proceed would be delayed from May 8th to August 2nd, was it?

A. No, sir.

Q. That type of delay was not something you ever contemplated when the contract was entered into, was it?

A. No, sir.

¶45. Regarding the second exception, that damages may be recovered for any delay that resulted from fraud, misrepresentation, or other bad faith on the part of the one seeking the benefit of the provision, the jury had before it the Utility Certification, which "certified" that the water line would be relocated by May 6, 1995. Testimony of Ronald Adams and Thomas Hymel demonstrated their reliance on the certification and their interpretation of the certification as a "guarantee" that the water line would be relocated by May 6, 1995.

¶46. Regarding the third exception, that damages may be recovered for any delay that has extended such an unreasonable length of time that the party delayed would have been justified in abandoning the contract, the jury could have inferred from the testimony presented that a three-month delay was unreasonable. Billy Key testified that a delay of this magnitude was not contemplated by the parties. Because of the three-month delay in issuing the Notice to Proceed, the project was delayed 222 days and spanned two winters, rather than the one winter originally contemplated by the parties.

¶47. Again, the "no damage for delay" provision clearly applies to the situation at hand. Thus, the fourth exception, that the delay is not within the specifically enumerated delays to which the clause applies, is not applicable in this case.

¶48. Given this evidence, the trial court did not err in denying the Commission's motions for a directed verdict and a judgment notwithstanding the verdict.

### IV. THE TRIAL JUDGE ERRED IN DENYING THE COMMISSION'S MOTION FOR NEW TRIAL.

¶49. The Commission makes no specific argument regarding the trial judge's denial of its motion for new trial. It can hardly be said that, in light of the above evidence, that the trial judge abused his discretion in denying the motion. This issue is without merit.

### V. ADAMS IS NOT ENTITLED TO AN AWARD OF POST-JUDGMENT INTEREST NOR THE STATUTORY APPEAL PENALTY.

¶50. Adams filed a notice of cross-appeal from the circuit court's order denying its motion for pre-judgment interest on January 2, 1998, but has withdrawn the request in light of this Court's recent holding in *City of Jackson v. Williamson*, 740 So. 2d 818 (Miss. 1999). Adams now argues that, under *Williamson*, it is entitled to post-judgment interest and the statutory appeal penalty.

¶51. The Commission argues that Adams is entitled to neither post-judgment interest nor the statutory appeal penalty.[5] The Commission's argument that Adams is not entitled to post-judgment interest is two-fold. First, the Commission requests that this Court reconsider its decision in *Williamson* regarding the liability of the State and its political subdivisions for post-judgment interest. The majority of this Court in *Williamson* concluded that the Legislature intended for political subdivisions to be assessed with post-judgment interest on appeal based on the fact that the Legislature did not specifically create an exemption for such an assessment in the Mississippi Tort Claims Act. *Williamson* at 821 (citing Miss. Code Ann. § 11-46-15(2) (Supp. 1998)). In so concluding, this Court overruled *City of Jackson v. Reed*, 233 Miss. 280, 103 So. 6 (1958), and *City of Mound Bayou v. Roy Collins Constr. Co.*, 457 So. 2d 337 (Miss. 1984), as well as their predecessors or progeny, to the extent they hold that the State and its political subdivisions are not liable for interest on a judgment unless specifically imposed by statute. *Williamson* at 822-23. Though the opinion of this Court in *Williamson* on the question of whether the City was required to pay the statutory appeal penalty was a plurality opinion, the majority held that the City was not exempt from paying post-judgment interest. The holding of the Court as to the liability of the State and its political subdivisions for the payment of post-judgment interest is thus binding authority, and this Court will not revisit its holding in *Williamson*.

¶52. Second, the Commission argues that even should this Court decline to revisit its holding in *Williamson*, the holding of *Williamson* should be applied only prospectively. The Commission filed its appeal in this case on December 19, 1997, approximately fourteen (14) months prior to the issuance of the Court's opinion in *Williamson*. Again, according to pre-*Williamson* case law, the State and its political subdivisions were not liable for post-judgment interest. *City of Jackson v. Reed*, 233 Miss. 280, 103 So. 2d 6 (1958).

¶53. As the United States Supreme Court explained in *James B. Beam Distilling Co. v. Georgia*, 501

U.S. 529, 111 S.Ct. 2439, 115 L. Ed. 2d 481 (1991), *superseded by statute on other grounds*, there are three ways in which a retroactivity issue may be resolved:

> First, a decision may be made fully retroactive, applying both to the parties before the court and to all others by and against whom claims may be pressed, consistent with res judicata and procedural barriers such as statutes of limitations. This practice is overwhelmingly the norm, and is in keeping with the traditional function of the courts to decide cases before them based upon their best current understanding of the law. It also reflects the declaratory theory of law, according to which the courts are understood only to find the law, not to make it. . . . Second, there is the purposely prospective method of overruling, under which a new rule is applied neither to the parties in the law-making decision nor to those others against or by whom it might be applied to conduct or events occurring before that decision. The case is decided under the old law but becomes a vehicle for announcing the new, effective law with respect to all conduct occurring after the date of that decision. . . .This approach claims justification in its appreciation that . . . to apply the new rule to parties who relied on the old one would offend basic notions of justice and fairness. But this equitable method has its own drawback: it tends to relax the force of precedent, by minimizing the costs of overruling, and thereby allows the courts to act with a freedom comparable to that of legislatures. Finally, a court may apply a new rule in the case in which it is pronounced, then return to the old one with respect to all others arising on facts predating the pronouncement. This method . . . breaches the principle that litigants in similar situations should be treated the same, a fundamental component of stare decisis and the rule of law generally.

*Jim Beam*, 501 U.S. at 535-37, 111 S.Ct. at 2443-44 (citations omitted).

¶54. This Court has stated that, as a rule, decisions of this Court are presumed to have retroactive effect unless otherwise specified. *Morgan v. State*, 703 So. 2d 832, 839 (Miss. 1997) (citing *Solem v. Stumes*, 465 U.S. 638, 642, 104 S.Ct. 1338, 1341, 79 L. Ed. 2d 579 (1984)). When this Court has held a ruling to apply only to cases subsequent to the opinion, it has specifically stated that the ruling is prospective in nature. *Morgan* at 839 (citing *Willie v. State*, 585 So. 2d 660, 681 (Miss.1991); *Hatten v. State*, 628 So. 2d 294, 298 (Miss.1993); *Lacy v. State*, 468 So. 2d 63 (Miss.1985); *Scarborough v. State*, 261 So. 2d 475 (Miss.1972); *State v. Hall*, 187 So. 2d 861 (Miss.1966)). This Court did not so specify in its holding in *Williamson*, and the presumption that opinions of this Court apply retrospectively applies in the case at hand.

¶55. The Mississippi Tort Claims Board, in its amicus curiae brief, urges this Court to employ the three-factor test set forth by the United States Supreme Court in *Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L. Ed. 2d 296 (1971). In *Chevron* the Supreme Court stated that in determining whether a decision should be applied retroactively, it would consider whether a decision displaces a principle of law on which reliance may reasonably have been placed, and whether prospectivity is on balance warranted by its effect on the operation of the new rule and by the inequities that might result from retroactive application. *Chevron*, 404 U.S. at 106-107, 92 S.Ct. at 355 (citations omitted). The Mississippi Board of Tort Claims submits that to apply *Williamson*'s holding regarding the liability for political subdivisions for post-judgment i nterest to claims arising prior to *Williamson* is inequitable because the Board is not prepared to satisfy post-judgment interest awards on already pending appeals.

¶56. The *Chevron* rationale was significantly limited by the Supreme Court's holding in *Jim Beam*. In *Jim*

*Beam*, a manufacturer of Kentucky bourbon filed an action in Georgia state court, seeking a refund of taxes it paid under a Georgia law which imposed an excise tax on imported liquor at a rate double that imposed on liquor manufactured from Georgia-grown products. The manufacturer relied upon an earlier decided case, *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 104 S.Ct. 3049, 82 L. Ed. 2d 200 (1984), wherein the Supreme Court had held a similar Hawaii law to violate the Commerce Clause. Although the manufacturer prevailed in the Georgia state court on the question of unconstitutionality of the Georgia statute, the trial court refused to apply its ruling retroactively, relying on *Chevron*. The Georgia Supreme Court affirmed. The United States Supreme Court reversed, stating that where a court applies the new rule of law in the case in which it is pronounced, the *Chevron* rationale does not apply to allow the court to return to the old rule with respect to all other cases arising on facts predating the pronouncement. *Jim Beam*, 501 U.S. at 538, 111 S.Ct. at 2445. The Court explained that because it had, in *Bacchus*, applied the new rule of law to the parties before the Court, principles of equity and stare decisis mandate that it must apply the new rule of law to all others. *Jim Beam*, 501 U.S. at 540, 111 S.Ct. at 2446. The Court stated that similarly situated litigants should be treated the same both in the criminal context and in the civil context, and that substantive law will not "shift and spring" on the particular equities of a particular case. *Jim Beam*, 501 U.S. at 540, 543, 111 S.Ct. at 2446-47. The Court stated, "Once retroactive application is chosen for any assertedly new rule, it is chosen for all others who might seek its prospective application. . . ." *Jim Beam*, 501 U.S. at 543, 111 S.Ct. at 2448.

¶57. This Court in *Williamson* applied its holding regarding the liability of the State and its political subdivisions for post-judgment interest to the litigants before the Court -- that is, this Court assigned to its holding in *Williamson* retroactive application by applying it to the litigants in that case. As explained by the United States Supreme Court in *Jim Beam*, this Court may not now selectively apply that holding. Adams is entitled to post-judgment interest.

¶58. The Commission also argues that it should not be required to pay the statutory appeal penalty assessed against appellants upon an affirmance of judgment by this Court pursuant to Miss. Code Ann. § 11-3-23 (1991). By plurality opinion in *Williamson*, this Court held that the statutory appeal penalty may be assessed against the State and its political subdivisions. Overruling prior law that the State and its political subdivisions are not subject to the statutory appeal penalty, *see City of Jackson v. Fortenberry*, 646 So. 2d 538 (Miss. 1994), the *Williamson* Court stated:

> The Mississippi Torts Claim Act makes no exception for the state relating to the imposition of statutory damages. We conclude the Legislature has addressed this issue by not including such an exception in the Torts Claim Act, while directly excepting the award of punitive damages, attorney's fees unless otherwise specified by law, and prejudgment interest. The Legislature has no more declared governmental entities, as appealing litigants, to be free from the statutory appeal penalty than it has declared itself to be free from interest. If it had, they would have so stated. The Legislature has had ample opportunity to do so. However, until it does so, governmental entities are on the same footing as any other litigant.

*Williamson*, 740 So.2d at 824. This Court here affirms the plurality opinion in *Williamson* and holds that the Commission is subject to the statutory appeal penalty.

## CONCLUSION

¶59. This Court finds that the Commission's assertions of error are without merit. The trial court's denials of

the Commission's motions for summary judgment, for directed verdict, for judgment notwithstanding the verdict, and for new trial are affirmed. Post-judgment interest and the statutory appeal penalty are assessed against the Commission.

¶60. **AFFIRMED ON DIRECT APPEAL; REVERSED ON CROSS-APPEAL.**

**PRATHER, C.J., SULLIVAN AND PITTMAN, P.JJ., BANKS, McRAE, WALLER AND COBB, JJ., CONCUR. MILLS, J., CONCURS IN RESULT ONLY.**

1. A Notice to Proceed is a letter received by the contractor from the Commission that actually gives the contractor permission to go to work. Without the letter, the contractor is prohibited from beginning work.

2. Under a restricted notice to proceed, the contractor begins work on the portion of the project that has been cleared of utility lines, etc., until the contractor receives full notice to proceed on the entire project.

3. In addition to costs allegedly incurred by crews and equipment sitting idle, Ronald Adams stated in this letter that additional costs would be incurred by his company being forced to "winter the project." Because of the cold and rainy weather associated with the winter months, the amount of work that can be done on a project is more limited than in other months of the year. Under the time table originally set by the Commission prior to the experienced delays, the Commission did not charge time during the winter months, that is, it did not expect the crews to work during those months. Because of the delay in issuing the Notice to Proceed, the time period for the project spanned over two winters (winters of '95/'96, and '96/'97), rather than only the winter of '95/'96 as originally anticipated.

4. The trial judge's order denying summary judgment does not state his reasons for the denial. However, the trial judge discussed his reasons for denying both the motion for summary judgment and the motion for directed verdict with counsel for both parties at the time he denied the motions.

5. The Mississippi Tort Claims Board has filed an amicus curiae brief also supporting these arguments.