# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2001-CA-01757-SCT

*ROBERT NEIDER AND STAN BUSH*

*v.*

*TOM FRANKLIN d/b/a PURE GOLD*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/3/2001 |
| TRIAL JUDGE: | HON. ROBERT H. WALKER |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | FRANK P. WITTMANN, III |
| | FRANK PHILIP WITTMANN, IV |
| ATTORNEY FOR APPELLEE: | WILLIAM MICHAEL KULICK |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND RENDERED IN PART - 02/13/2003 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE PITTMAN, C.J., WALLER AND CARLSON, JJ.**

**WALLER, JUSTICE, FOR THE COURT:**

¶1.     Robert Neider and Stan Wayne Bush appeal from a judgment entered on a unanimous jury verdict in favor of Tom Franklin on Franklin's claims of tortious interference with contractual relations against Neider and breach of contract against Bush. We affirm the jury's award of $50,000 to Franklin and reverse and render the award of $100,000 in punitive damages.

## FACTS AND PROCEDURAL HISTORY

¶2.     Tom Franklin owns and operates Pure Gold, a song and dance nightclub act featuring hits from the 1950s, 1960s, and 1970s.  Pure Gold performed predominantly at casinos on the Mississippi Gulf Coast.  On November 5, 1998, Pure Gold lead singer Stan Wayne Bush[1] entered into a "personal service agreement" purportedly obligating him to perform for Pure Gold for 1999 and 2000.  The contract provided in pertinent part, "I also understand that If [sic] I leave the show for any reason what so ever [sic] I can not [sic] play or sing in a group within a 100 miles [sic] of Gulfport[,] Mississippi.  For six months. [sic]"[2]

¶3.     The relationship between Franklin and Bush soured to the point where Bush quit Pure Gold on October 25, 1999, with fourteen months remaining on his contract.[3]  During the time leading to Bush's exodus from Pure Gold, Bush and his wife had become close friends with Robert Neider, an airline pilot, and his wife Margaret.  The Neiders were Louisiana residents and regulars at the Pure Gold show which at the time was performing mostly at Casino Magic.  According to Neider, his involvement with Bush began when Margaret befriended Bush's wife Jessica and agreed to finance a CD for Stan via a loan of several thousand dollars.

---

[1]Among Bush's impersonations were Elvis Presley and Tom Jones.

[2]The contract also provided for various fines and penalties to be imposed for appearing late for performances and rehearsals and for showing up "drunk, high, or in any other way incapacitated. . . ."

[3]Bush's notification of resignation consisted of a letter with an extremely distasteful cartoon attached to the bottom.

¶4. Bush informed Franklin that he had a better deal in the works and requested a release from his contract. According to Franklin, he wanted to see the contract in which Bush would enter so that he could look out for Bush's best interests. Neider's Louisiana attorney prepared an employment contract dated January 1, 2000, between Bush and Stan Wayne Productions, Inc., an entity in which Robert Neider was president. Neider's Louisiana attorney thereafter wrote Franklin requesting that Bush be released from his contract. Franklin responded with a buy-out offer whereby Neider could purchase the remainder of Bush's contract for $20,000. This offer was never accepted, but Bush nonetheless left Pure Gold.

¶5. On the same day Bush quit Pure Gold, Franklin sent a letter to Neider to cease interfering with Pure Gold performer contracts.[4] However, after Bush left Pure Gold, Neider and his wife essentially bankrolled Bush. Franklin characterizes Neider's support as evidence of interference, but Neider and Bush characterize the support as a loan. From November 2, 1999, to March 2000, the Neiders wrote approximately 80 checks totaling nearly $60,000 with 26 checks being made out to either Stan Bush or Jessica Bush. Three of the checks written to Stan Bush indicated on the "for" line of each check that they were paychecks. Checks indicating for what they were written include CD's, show tracks, costumes, amplifier repair, hair weave, lighting equipment, studio rent, etc. Of the total

_____

[4]Franklin also obtained a temporary restraining order in Harrison County Chancery Court enjoining Bush and Neider from competing with Pure Gold. At a later contempt hearing, the chancellor found that Bush and Neider were not competing with Pure Gold within 100 miles of Gulfport.

number of checks, nearly 40 were written during the six-month restriction period of the contract. The Neiders also allowed Bush to use one of their cars.

¶6. On November 10, 1999, Franklin filed this civil action for damages in the Harrison County Circuit Court against Bush for breach of contract and Neider for tortious interference with contractual relations. A jury returned a unanimous verdict in favor of Franklin and awarded him $50,000 in compensatory damages and $100,000 in punitive damages. Judgment was entered in accordance with the verdict. After a hearing on the defendants' motion for JNOV, new trial, or remittitur, the trial judge amended the judgment to reflect that both Bush and Neider were jointly and severally liable for the compensatory damages but only Neider was liable for the punitive damages. Aggrieved, Bush and Neider appeal and assert five assignments of error.

## DISCUSSION

**I. WHETHER THE TRIAL JUDGE ERRED IN FINDING THAT A VALID EMPLOYMENT CONTRACT EXISTED BETWEEN BUSH AND FRANKLIN.**

¶7. Bush argues that his contract to perform for Pure Gold was unconscionable and ambiguous. At trial, Bush never objected to the contract's admissibility[5] or ever complained that it was unconscionable or ambiguous. We have consistently held that a trial court will not be put in error on appeal for matters not presented to it for decision. *Farmer v. B & G Food Enters., Inc.*, 818 So. 2d 1154, 1160 (Miss. 2002); *Boyles v. Miss. State Oil & Gas Bd.*, 794 So. 2d 149, 153 (Miss. 2001); *Brown v. Miss. Transp. Comm'n*, 749 So. 2d 948,

---

[5]The parties even stipulated to the admissibility of the contract.

4

952 (Miss. 1999); *Lemon v. Miss. Transp. Comm'n*, 735 So. 2d 1013, 1024 (Miss. 1999);

*Mills v. Nichols*, 467 So. 2d 924, 931 (Miss. 1985).  As such, this issue was waived and is

procedurally barred.

> **II.   WHETHER THE TRIAL JUDGE IMPROPERLY ALLOWED THE INTERPRETATION OF THE PERSONAL SERVICES CONTRACT TO GO TO THE JURY.**

¶8.   Bush next argues that interpretation of the contract was a question of law that should

not have gone to the jury.  The trial judge specifically stated, in overruling the defendants'

motion for directed verdict, that interpretation of the contract presented a jury question.

¶9.   We find Bush's argument unpersuasive.   The question of law/question of fact

dichotomy requires a two-step inquiry in contract law.  First of all, it is a question of law for

the court to determine whether a contract is ambiguous and, if not, enforce the contract as

written. *Miss. Transp. Comm'n v. Ronald Adams Contractor, Inc.*, 753 So. 2d 1077, 1087

(Miss. 2000); *Universal Underwriters Ins. Co. v. Ford*, 734 So. 2d 173, 176 (Miss. 1999);

*IP Timberlands Operating Co., Ltd. v. Denmiss Corp.*, 726 So. 2d 96, 106 (Miss. 1998).

In the event of an ambiguity, the subsequent interpretation presents a question of fact for the

jury which we review under a substantial evidence/manifest error standard.  *Clark v. State

Farm Mut. Auto. Ins. Co.*, 725 So. 2d 779, 781 (Miss. 1998); *Lamb Constr. Co. v. Town

of Renova*, 573 So. 2d 1378, 1383 (Miss. 1990) (citing *Bryant v. Cameron*, 473 So. 2d 174,

179 (Miss. 1985)).

¶10.   The trial judge properly found the contract presented an issue for the jury.  In ruling on the motion for directed verdict, the trial judge stated his explanation for submitting the interpretation of the contract to the jury:

> It appears to the Court, however, that the noncompetition agreement [the six-month restriction] is simply an additional concession that the performer makes, and it does not relieve the performer of his other duties and obligations under the contract. That's what it appears to the Court.  But I think this is probably a jury question as to that.  And if it–and if the jury determines that it is simply an additional concession, therefore his leaving the troop before the expiration of a two-year period would constitute a breach of contract, regardless of whether he abides by the noncompetition agreement or not.

The trial judge was correct in his conclusion that there was a jury issue, since the six-month restriction quoted above lent itself to differing interpretations.  Bush likewise failed to object to submitted jury instructions outlining the jury's role in interpreting the contract.  This assignment of error is without merit.

### III.   WHETHER FRANKLIN'S PROOF OF NEIDER'S TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS WAS SUFFICIENT.

¶11.   Neider's argument on this issue is essentially a sufficiency of the evidence argument.  In particular, Neider argues that Franklin failed to establish every element of tortious interference with contractual relations.  The trial judge instructed the jury on tortious interference with contractual relations and not only did Neider fail to object to the submitted instruction, he also submitted one himself on the tort.

6

¶12.    To establish a claim of tortious interference with contractual relations, a plaintiff must prove:

> (1) that the acts were intentional and willful; (2) that they were calculated to cause damage to the plaintiffs in their lawful business; (3) that they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice); and (4) that actual damage and loss resulted.

*Par Indus., Inc. v. Target Container Co.*, 708 So. 2d 44, 48 (Miss. 1998) (quoting *Cenac v. Murray*, 609 So. 2d 1257, 1268-69 (Miss. 1992)).  Regarding intent, a showing of specific intent is not required.  Rather, intent can be inferred when a defendant knows a contract exists between two parties and does a wrongful act that he is certain or reasonably certain will interfere with the contract. *Cranford v. Shelton*, 378 So. 2d 652, 655 (Miss. 1980). *See also Liston v. Home Ins. Co.*, 659 F. Supp. 276, 281 (S.D. Miss. 1986).

¶13.    In the instant case, Neider knew that Bush was under contract with Franklin.  After negotiations for the buy-out of Bush's contract failed, Neider had his attorney prepare an employment contract between Stan Wayne Productions, Inc., which listed Neider as president, and Bush as employee.  While Neider and Bush contended that this employment contract was an attempt to "fool" Franklin, it is certainly illuminating of Neider's recognition of Bush's contract with Franklin.  Also, the number of checks written by Neider and his wife and the amounts thereof shed light on the extent of Neider's involvement with Bush.  This evidence was sufficient to present the claim to the jury.

## IV. WHETHER THE COMPENSATORY AND PUNITIVE DAMAGES AWARDS WERE AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.

¶14. Franklin presented evidence of expenses incurred in finding a replacement for Bush. According to Franklin, Bush was the biggest star and talent in Pure Gold, and his departure required extensive travel to places like Las Vegas and Iceland to interview and audition replacements. However, Neider presented testimony from Casino Magic's entertainment manager who was responsible for booking entertainment acts that Bush was not a factor whatsoever in the casino's booking of Pure Gold. Franklin also claimed as damages: $93,862 for substitute performers; $50,000 in booking decreases; and $112,084 in various travel, lodging and other out-of-pocket expenses.

¶15. Although Franklin requested $200,000 in compensatory damages, the jury only awarded $50,000. Such an award is not contrary to the overwhelming weight of the evidence, and we will not disturb it. We have held that on review of whether a jury's verdict was against the overwhelming weight of evidence, we will defer to the jury's determinations of credibility and weight when the evidence is conflicting. *Ducker v. Moore*, 681 So. 2d 808, 811 (Miss. 1996); *Wallace v. Thornton*, 672 So. 2d 724, 727 (Miss. 1996); *Sessums v. Northtown Limousines, Inc.*, 664 So. 2d 164, 168 (Miss. 1995); *Odom v. Roberts*, 606 So. 2d 114, 118 (Miss. 1992).

¶16.    On the issue of punitive damages, Neider argues that the evidence presented did not warrant a punitive damages instruction.  Franklin of course counters that Neider's actions were clearly blatant and egregious.

¶17.    To qualify for punitive damages, the following is the oft-cited general rule:

> In order for punitive damages to be awarded, the plaintiff must demonstrate a willful or malicious wrong or the gross, reckless disregard for the rights of others.  Punitive damages are only appropriate in the most egregious cases so as to discourage similar conduct and should only be awarded in cases where the actions are extreme.  The jury should be allowed to consider the issue of punitive damages if the trial judge determined under the totality of the circumstances and in light of defendant's aggregate conduct, that a reasonable, hypothetical juror could have identified either malice or gross disregard to the rights of others.

*Paracelsus Health Care Corp. v. Willard*, 754 So. 2d 437, 442 (Miss. 1999) (citations omitted).  *See* Miss. Code Ann. § 11-1-65 (2002).  Regarding intent, we have held that the "kinds of wrongs to which punitive damages are applicable are those which, besides the violation of a right or the actual damages sustained, import insult, fraud, or oppression and not merely injuries but injuries inflicted in the spirit of wanton disregard for the rights of others."  *Summers ex rel. Dawson v. St. Andrew's Episcopal Sch., Inc.*, 759 So. 2d 1203, 1215 (Miss. 2000) (citing *Fowler Butane Gas Co. v. Varner*, 244 Miss. 130, 150-51, 141 So. 2d 226, 233 (1962)).

¶18.    After a thorough review of the record, we find no evidence sufficient to establish such a level of intent.  Neider's activity throughout his involvement with Bush and Franklin reveals no sinister motive on his part to damage Franklin.  On the contrary, the evidence,

9

while supporting Franklin's claim for interference, indicates that Neider only wanted to help Bush, not damage Franklin. If in helping Bush Neider somehow damaged Franklin, it does not warrant the imposition of $100,000 in punitive damages.

## V. WHETHER THE COURT ERRED IN GRANTING A PUNITIVE DAMAGES INSTRUCTION TO THE PLAINTIFF.

¶19. An award of punitive damages is appropriate only in the most egregious cases to discourage similar conduct and awarded only in cases where the defendant's actions are extreme. *Malone v. Capital Corr. Res., Inc.*, 808 So. 2d 963, 969 (Miss. 2002) (citing *Willard*, 754 So. 2d at 442). However, as stated above, there being insufficient evidence of Neider's intent to damage Franklin, we hold that the trial judge erred in giving a punitive damages instruction.

## CONCLUSION

¶20. We hold that Bush's unconscionability argument is procedurally barred and his contract interpretation argument is without merit. We also hold that there was sufficient evidence to support a claim of Neider's interference and the jury's award of compensatory damages. However, we find insufficient evidence to support the award of punitive damages. We therefore affirm the jury's award of $50,000 in compensatory damages and reverse and render the award of $100,000 in punitive damages.

¶21. **AFFIRMED IN PART; REVERSED AND RENDERED IN PART.**

**PITTMAN, C.J., McRAE AND SMITH, P.JJ., COBB, EASLEY AND CARLSON, JJ., CONCUR. DIAZ, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. GRAVES, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION.**